# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **APRIL SABBE, Individually and as Personal Representative of the Estate of Remi Sabbe, Deceased**, <br><br>         Plaintiff, <br><br>     v. <br><br> **WASHINGTON COUNTY BOARD OF COMISSIONERS; SHERIFF PATRICK GARRETT, in his individual capacity; SGT. CHRIS BOWMAN, in his individual capacity; SGT. CHAD LOTMAN, in his individual capacity; DEPUTY EARL BROWN, in his individual capacity; CORPORAL CADE EDWARDS, in his individual capacity**, <br><br>         Defendants. | Case No. 3:19-cv-02106-IM <br><br> **OPINION AND ORDER** |

Louren G. Oliveros, Gorence & Oliveros, P.C., 300 Central Ave. SW, Suite 1000E, Albuquerque, NM 87102. Attorney for Plaintiff.

Eugene P. Ramirez, Scott Wm. Davenport, and Tony M. Sain, Manning & Kass, Ellrod, Ramirez, Trester, 801 S. Figueroa Street, 15th Floor, Los Angeles, CA 90017; Jason M. Bush, Washington County Counsel, 155 N. First Ave, Suite 340, MS #24, Hillsboro, OR 97124. Attorneys for Defendants.

**IMMERGUT, District Judge.**

This action arises from a fatal encounter between Remi Sabbe and police officers on January 12, 2018 in Sherwood, Oregon. Plaintiff April Sabbe, individually and as personal representative of the estate of Remi Sabbe, filed suit against Defendants Washington County Board of Commissioners, Sheriff Patrick Garrett, Sergeant Chris Bowman, Sergeant Chad Lotman, Deputy Earl Brown, and Corporal Cade Edwards. ECF 1. This matter comes before the Court on Defendants' Motion for Summary Judgment. ECF 41. This Court held a hearing on Defendants' motion on April 15, 2021. ECF 53. After considering the record, written briefs, and arguments of counsel, this Court finds that summary judgment on all of Plaintiff's federal claims is appropriate, and grants Defendants' motion on those claims. Further, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and dismisses them without prejudice.

## BACKGROUND[1]

The following facts were either undisputed at summary judgment or, if disputed, are recounted in the light most favorable to Plaintiff, the non-moving party. Where an unchallenged video captures portions of the factual background, this Court "allow[s] the videotape to speak for itself." *Scott v. Harris*, 550 U.S. 372, 378 & n.5 (2007).

---

[1] In their reply, Defendants objected to several of Plaintiff's exhibits, including ECF 47-11 (KPTV news video) and ECF 47-24 (photographs of armored vehicles), for want of authentication, foundation, and hearsay. ECF 49 at 7. At the April 15, 2021 hearing on this motion, Defendants withdrew their objections to ECF 47-11 so long as the Court considered it for the limited purpose of depicting the encounter between Remi Sabbe and the V150 on the Sabbe property. As such, the Court limits its consideration of ECF 47-11 to the portions showing the encounter between Remi Sabbe and the V150. Any audio or clips of newscasters are not considered by this Court. Defendants also withdrew their objection to ECF 47-24 at the hearing, and those photos will be considered by the Court. This Court need not address Defendants' remaining evidentiary objections because those exhibits would not alter the Court's findings in this case.

At roughly 1:33 p.m. on January 12, 2018, Lloyd Wetzel called 911 from his home to report that a pickup truck was driving around a nearby field and "making a mess of it." ECF 34 at ¶ 5. The field was muddy due to recent weather conditions. *Id.* at ¶ 2. Mr. Wetzel was referring to a neighboring property in Sherwood, Oregon, consisting of 84 acres of partially wooded areas, fields, structures, and a residence. *Id.* at ¶ 1. A part of the property abuts two public roadways, SW Roy Rogers Road and SW Scholls-Sherwood Road. *Id.*; *see also* ECF 47-8 at 7 (outline of the Sabbe property); ECF 47-8 at 8 (ariel view of an open field on the Sabbe property). The property was owned by the Sabbe family and located at 19803 SW Roy Rogers Road. ECF 34 at ¶¶ 1, 3.

Responding to the call, Sherwood Police Department Officer Corey Jentzsch arrived on the scene. *Id.* at ¶ 8. He pulled over to a turnout bordering the Sabbe property in his marked patrol car. ECF 47-10. When Officer Jentzsch arrived, he saw a Dodge truck being driven by a lone white male, later identified as Remi Sabbe ("Sabbe"). ECF 34 at ¶ 9. The driver, stopped close to the public roadway and turnout on the edge of the field, saw Officer Jentzsch pull in and then almost immediately backed away, driving further into the field. ECF 47-10 (dash cam footage from Officer Jentzsch's patrol car from January 12, 2018); ECF 47-3 at 2 (CAD report[2] from January 12, 2018).

Officer Jentzsch then continued to observe Sabbe from the turnout as he was "tearing up" the fields with his truck. ECF 47-23 at 2:25–30. Shortly thereafter, Officer Jentzsch reported seeing Sabbe hit a tree with his truck, although Sabbe appeared unharmed by the crash. ECF 47-23 at 2:50–3:01; ECF 47-3 at 2–3.

---

[2] "A CAD report is a stenographic record created by a radio dispatcher whose duty it is to type everything heard over the radio frequency, which also marks the time of the statements fairly accurately." *Long v. City and Cnty. of Honolulu*, 511 F.3d 901, 904 n.1 (9th Cir. 2007).

At approximately 1:48 p.m., Mr. Wetzel called 911 again and reported that he may have heard a gunshot or rifle shot nearby. ECF 34 at ¶ 6; ECF 47-22; ECF 47-3 at 2–3. Mr. Wetzel also reported that he knew that the driver of the truck on the field was Remi Sabbe, the property owner. He reported that Sabbe may be impaired and belligerent. ECF 34 at ¶ 7; ECF 47-22; ECF 47-3 at 2–3.

At around 1:53 p.m., Officer Jentzsch also heard gunshots from the Sabbe property, but he did not see who fired them. ECF 47-3 at 3; ECF 47-2 at 2; ECF 47-23 at 3:48–52. He then observed Sabbe holding a black object in his hands, which he thought looked like a rifle. ECF 47-2 at 3; ECF 47-23 at 4:57–5:00 ("It looks like he might have a rifle."). Officer Jentzsch observed Sabbe raise what he believed to be a rifle and point it at the intersection of SW Roy Rogers and SW Scholls-Sherwood roads. ECF 47-2. at 3; *see also* ECF 47-3 at 3–4; ECF 47-23 at 12:01–10. He never saw Sabbe point a rifle directly towards him. ECF 47-2 at 3. Officer Jentzsch then drove away, seeking to put distance between himself and Sabbe out of concerns for his own safety. Officer Jentzsch then requested for additional units to contain the area. ECF 34 at ¶ 10; ECF 47-2 at 3–4 .

Around 2:15 p.m. a police command post was established near the Sabbe property at 16920 SW Roy Rogers Road. ECF 34 at ¶ 11; ECF 47-3 at 4 ("[Command Post] is Al Garden Center"). The command post was initially led by Sergeant Bowman of the Sherwood Police Department. ECF 34 at ¶ 14. Sergeant Bowman ordered two Washington County armored vehicles to come to the command post. *Id.* at ¶ 15.

After the command post was established, Kevin Sabbe, Remi Sabbe's brother, arrived. ECF 47-7 at 9. While there, Kevin told members of law enforcement[3] that his brother was not violent, but that he was probably scared. *Id.* at 10. Law enforcement never requested Kevin's permission to enter the Sabbe property, nor did Kevin ever consent to the officers entering the family property. *Id.* at 9.

Sometime before 2:50 p.m., Plaintiff April Sabbe, Remi Sabbe's wife, was contacted by phone by analyst Leah Turner of the Washington County Sheriff's Office while Mrs. Sabbe was at work. ECF 47-26 at 1. Mrs. Sabbe reported to Ms. Turner that the person in the Dodge Ram was likely her husband, Remi Sabbe. ECF 47-9 at 2. According to an email from Ms. Turner to the Critical Negotiation Unit of the Washington County Sheriff's Office, April Sabbe also relayed several pieces of information, including that Sabbe had broken his phone the night before when he was angry, he was an alcoholic and had been drinking that day, he was mean and had anger issues when he was drinking, he did not like police, he had a history of "elude," the couple had no children, and he should be on the property alone. ECF 47-26 at 1. Mrs. Sabbe also shared that Remi Sabbe would likely try to make his way back to their house at some point; his truck had Onstar and could be remotely disabled by Onstar; and a recent burglary at the property was making him angry—he kept going out there to "protect" it. *Id.* Some of this information was also reported over the radio at 3 p.m. to other officers. ECF 47-3 at 8.

Around 2:30 p.m., Ms. Turner sent an email to the Critical Negotiation Unit that included photographs of Plaintiff Mrs. Sabbe, Remi Sabbe, and Kevin Sabbe. ECF 47-26 at 2–5; ECF 34 at ¶ 12. At approximately 2:25 p.m., Sabbe's Dodge Ram, identified as the suspect vehicle, was

---

[3] Kevin does not know the names of the law enforcement officers he spoke with at the command center. ECF 47-7 at 9.

reported to be associated with the Sabbe property. *Id.* at ¶ 13. By 2:45 p.m., the command post leader, Sergeant Bowman, received word that the man driving the truck was Remi Sabbe. ECF 47-5 at 10–11.

Between Officer Jentzsch's initial departure from the Sabbe property at 1:46 and 2:48 p.m., there were no further reports of shots being fired on the Sabbe property. During that time, law enforcement officers worked to close off the public roads surrounding the Sabbe property and position themselves around the perimeter of the Sabbe property to secure Sabbe from entering public roads and posing a risk to the public, and to prevent members of the public from getting close to the scene. ECF 47-5 at 5–6 ("I didn't want [Sabbe] to go mobile . . . because he's armed with a rifle, drunk and belligerent and fired some shots . . . I didn't want civilian traffic coming . . . into the incident."), 13–14; ECF 47-23 at 40:56–43:25. Nearby schools were also put on lockdown. ECF 47-3 at 7, 11; ECF 47-23 at 45:32–46:00. The scene drew media attention, and at some point at least one media helicopter hovered over the Sabbe property. ECF 47-6 at 5. It created so much noise that officers had trouble hearing each other over the radio, and asked that the helicopter move farther away from the scene. ECF 47-23 at 1:03:39–52, 1:05:08–12; 1:10:46–11:04; ECF 47-3 at 8 (reporting media helicopter should "be moving" away).

At approximately 2:48 p.m., Lieutenant Chad Lotman arrived at the command center and took over for Sergeant Bowman. ECF 34 at ¶ 14. The armored vehicles arrived shortly thereafter. *Id.* at ¶¶ 15–16. The armored vehicles included an unmarked armored "V150'" and a marked armored "BEAR" vehicle. ECF 34 at ¶¶ 15–16; *see also* ECF 47-24. The V150 was manned by eight officers, including Earl Brown and Cade Edwards, Defendants in this case. ECF 34 at ¶ 17. The V150 was a "large tank-like vehicle, absent of mounted guns. The vehicle ha[d] large oversized rugged tires, yielding an overall vehicle height of more than 6 ½ feet." ECF 47-14 at 3.

It was, "[t]o a degree, bullet proof" and would "stop most bullets." ECF 47-18 at 3. The armored

vehicles were perched near the driveway to the Sabbe property in a public roadway. ECF 47-6 at

7. Uniformed officers and marked patrol vehicles were also perched in that area with their

overhead lights on. *Id.* at 8.

Around 3:27 p.m., Sabbe started driving his truck again. ECF 47-5 at 9; ECF 47-3 at 10.

Lieutenant Lotman then deployed the armored vehicles to the Sabbe property at 3:29 p.m. ECF

42-5 at 4–5; ECF 34 at ¶ 18; ECF 47-3 at 10. ECF 47-6 at 10. The officers intended to contain

the problem and open a line of communication with Sabbe, while staying protected from any

potential gunfire. ECF 47-6 at 2, 8, 10. It is undisputed that the officers did not have a warrant to

enter the property or consent from anyone in the Sabbe family.

Sabbe's truck moved westbound, away from the armored vehicles moving onto the

property. ECF 47-23 at 1:12:55–59; ECF 47-6 at 8. The V150 continued to move into the field as

Sabbe moved westbound. ECF 47-23 at 1:13:33–1:14:23. Sabbe drove towards a patrol car

perched at the property's wood line with its red and blue lights flashing. ECF 47-6 at 8.

Sabbe then turned around and came eastbound towards the V150. ECF 47-23 at 1:14:27–

34; ECF 47-6 at 8. Sabbe's truck drove right at the V150 and rammed into it before turning away

and continuing to drive. ECF 47-11 at 1:15–18; ECF 47-23 at 1:14:53–58. The officers then

attempted to disable Sabbe's truck by stalling the motor out using a Pursuit Intervention

Technique (PIT) maneuver.[4] *See* ECF 47-6 at 23. The purpose of the PIT maneuver was to

apprehend Sabbe and take him into custody. *Id.* at 10–11, 23.

---

[4] A PIT maneuver is a method of forcing a fleeing car to abruptly turn sideways, which
causes the driver to lose control and stop. It involves officers using their vehicle to veer into the
rear half of either the driver's side or passenger's side of a suspect's car. *See Longoria v. Pinal
County*, 873 F.3d 699, 703 n.2 (9th Cir. 2017).

The front of the V150 collided with the passenger-side rear door of the Dodge Ram to disable it. ECF 47-11 at 1:21–1:48. The first attempt at the PIT maneuver was unsuccessful and Sabbe continued driving. *Id.* at 1:21–34. Sabbe's car then slowed down to a stop as the driver's-side front door swung open. Sabbe appeared to start to leave the vehicle. *Id.* at 1:34. Before he could do so, however, the V150 made contact with his truck again, striking the rear passenger-side. *Id.* at 1:34–38. The V150 pushed the truck so that it rotated in a clockwise direction. *Id.*; ECF 43-1 at 0:01–06. When the truck was perpendicular to the V150, it moved forward again. The V150 continued to push the truck again so that it rotated further clockwise. *Id.* at 0:06–12; ECF 47-11 at 1:40–47.

Officer Brown then opened the turret of the V150 and pointed his gun in Sabbe's direction. ECF 43-1 at 0:10–12. Officer Brown stated that as he was in the process of getting out of the turret, Sergeant b told him the man in the truck was "pointing a rifle at us." ECF 47-16 at 9. Officer Brown says that as he came out of the turret, he saw Sabbe pointing a rifle at the V150 through the rear passenger-side window of the truck, heard a gunshot, and saw glass exploding out from the rear passenger-side window of the truck before he fired multiple rounds back at Sabbe. ECF 47-16 at 9–10. Officer Edwards, who was also in the V150, says he heard a gunshot outside, after which he decided to lean out of the side-opening of the V150. ECF 42-8 at 19. He then observed Sabbe "maneuvering his rifle to point out the passenger side of the car," towards the V150. Officer Edwards fired one round at Sabbe. ECF 42-8 at 18–21. The CAD report indicates shots were fired around 3:31 p.m. and that the "susp[ect] fired on law enforcement." ECF 47-3 at 10. Following the shots, both vehicles then came to a full stop. ECF 43-1 at 0:18; ECF 47-11 at 1:48.

Video recordings of the encounter show that almost as soon as Officer Brown was fully out of the turret, smoke plumes around the vehicle indicate shots were fired. The videos do not clearly indicate who fired the first shot. ECF 43-1 at 0:10–18; ECF 47-11 at 1:42–48.

Sabbe died on the field sometime thereafter from his gunshot wounds. ECF 47-3 at 10–11; *see also* ECF 1 at ¶ 93; ECF 10 at ¶ 57. The CAD report indicates an AR-15 style assault rifle was recovered from Sabbe immediately following the shooting. ECF 47-3 at 10; ECF 43-2; *see also* ECF 47-23 at 1:15:39–1:16:34.

Plaintiff April Sabbe filed suit against Defendants in federal court on December 30, 2019. ECF 1. Plaintiff brings Fourth Amendment, substantive due process, and *Monell* claims pursuant to 42 U.S.C. § 1983. *Id.* at ¶¶ 106–125. Plaintiff also brings supplemental state law claims for wrongful death, negligence, assault, battery, and failure to train. *Id.* at ¶¶ 126–157. Defendants now move for summary judgment on all of Plaintiff's claims. ECF 41.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). However, the court is not required to accept a non-movant's version of events when it is "clearly contradict[ed]" by a video in the record. *Scott*, 550 U.S. at 378–81.

Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the

[non-movant's] position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party meets that burden, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Id.* (quoting *Matsushita*, 475 U.S. at 586).

## DISCUSSION

### A. Qualified Immunity[5]

Defendants assert they are entitled to qualified immunity on all of Plaintiff's federal claims. ECF 41-1 at 14–16. As a threshold matter, this Court notes qualified immunity is not available to Defendants as a defense for Plaintiff's *Monell* claim, analyzed further below. *Owen v. City of Independence*, 445 U.S. 622, 655–58 (1980); *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019) ("Although the requisites for municipal liability under § 1983 can be stringent, municipalities sued under § 1983, unlike individuals, are not entitled to immunity, qualified or otherwise . . . ."). However, for Plaintiff's Fourth Amendment and substantive due process claims, qualified immunity is available as a complete defense for

---

[5] Plaintiff urges this Court to disregard the doctrine of qualified immunity for actions pursued under 42 U.S.C. § 1983. ECF 46 at 40. Unless and until binding authority declares otherwise, this Court must apply the doctrine as precedent directs.

individual defendants sued in their individual capacity. Therefore, those claims will be analyzed within the qualified immunity framework.

In determining whether an officer is entitled to qualified immunity, this Court considers: (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). The Court addresses each question in turn.

## 1. Excessive Force

Plaintiff contends genuine disputes of material fact preclude summary judgment on her claim that Defendants used unconstitutionally excessive force in attempting to disable Sabbe's truck using a PIT maneuver, and in fatally shooting and killing Sabbe. ECF 46 at 29–39.

To determine whether the force used by the officers was excessive under the Fourth Amendment, the Court must determine whether the officers' actions were objectively reasonable under the totality of the circumstances. *Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 642 (9th Cir. 2018); *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010). Guiding the determination, courts consider: (1) "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,"; (2) "the government's interest in the use of force"; and (3) "the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc) (quoting *Glenn v. Wash. Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011)).

To determine the nature of the government interests at stake, the Court can consider several factors, including: (1) whether the suspect posed an immediate threat to anyone; (2) whether the suspect resisted or attempted to evade arrest; and (3) the severity of the crime at issue. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc). These factors are non-exhaustive, and should be examined under the

totality of the circumstances. *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021). Other factors courts can consider include the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that a person is suffering from an emotional disturbance. *Glenn*, 673 F.3d at 872.

Whether a use of force was reasonable depends on the unique facts of each case and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Only information known to an officer at the time of the officer's conduct is relevant to the analysis. *Glenn*, 673 F.3d at 873 n.8.

### a. The PIT Maneuvers

First this Court considers how to characterize the level of force exacted against Sabbe when the officers attempted two PIT maneuvers on his car. Plaintiff argues the PIT maneuvers constituted deadly force. ECF 46 at 29–30. The Ninth Circuit defines deadly force as force that creates a substantial risk of causing death or serious bodily injury. *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005) (en banc). Plaintiff points only to the deposition of Sergeant Braun, driver of the V150, to support the assertion that the PIT maneuvers attempted on Sabbe's vehicle should be characterized as "deadly force." Sergeant Braun testified that PIT maneuvers can be, under certain circumstances, highly probable to result in great bodily injury or death.[6] ECF 47-6 at 23.

---

[6] Although neither side raised the issue, this Court notes that Plaintiff did not name Sergeant Braun, driver of the V150, as a defendant in this case. Because there is no *respondeat superior* liability in § 1983 actions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), it is unclear to whom Plaintiff attempts to assign liability for use of the PIT maneuver against Sabbe.

The Court acknowledges the obvious reality that PIT maneuvers can be highly dangerous in certain scenarios such as high-speed car chases. The Court also acknowledges the potential heightened risks posed by attempting a PIT maneuver with the V150, as opposed to a typical police patrol car. However, in this case, video recordings of the encounter indicate the vehicles in question did not appear to be moving at high speeds when the PIT maneuvers were attempted. Moreover, the PIT maneuvers were only attempted on the back passenger-side door of Sabbe's truck, away from where he was sitting. The extent of Sabbe's injuries, if any, from the PIT maneuvers themselves is also unclear. From the videos submitted by the parties, Sabbe was able to continue driving away after the first PIT maneuver attempt, and also appeared to try to get out of his car at one point before the next PIT maneuver occurred.

In light of these considerations, this Court finds that the PIT maneuvers in this case are not appropriately characterized as deadly force. However, the record is not sufficient to determine the precise level of force applied to these facts. Therefore, this Court proceeds to determine whether the force exacted by the PIT maneuvers was reasonable, keeping in mind the aforementioned circumstances surrounding their use in this case. *See Scott*, 550 U.S. at 383 ("Whether or not [a defendant's] actions constituted application of 'deadly force,' all that matters is whether [the defendant's] actions were reasonable."); *see also Mattos*, 661 F.3d at 443 (adopting a similar approach and proceeding to assess reasonableness without determining the level of force used when a taser is deployed in drive-stun mode, "keeping in mind the magnitude of the electric shock at issue and the extreme pain [ ] experienced").

The Court next turns to the government's interest in the use of force at issue. As the V150 entered the Sabbe property, a video recording reveals that Sabbe escalated the encounter by ramming his large pickup truck into the V150. ECF 47-11 at 1:15–18. At that point, the officers'

goal changed from negotiation/communication to arrest. ECF 47-6 at 10. The officers next attempted to seize Sabbe through the use of a PIT maneuver. The V150 made contact with the truck two times. ECF 47-11 at 1:22–1:48. The first attempt was unsuccessful and Sabbe attempted to drive away unharmed from the V150. *Id*. at 1:22–1:33. On the second attempt, the V150 slowly pushed the bed of Sabbe's truck so that it rotated clockwise. *Id.* at 1:33–1:48; ECF 43-1 at 0:01–19.

The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety. *Mattos*, 661 F.3d at 441. The officers' use of the PIT maneuver to prevent Sabbe's escape was not unreasonable given the circumstances. Sabbe clearly posed an immediate threat to the safety of all of the officers responding to the incident, including those surrounding the perimeter of the property, when he drove his truck into the V150 and then attempted to flee. At the time, the officers knew that Sabbe was likely armed with a firearm and intoxicated. Sabbe's wife told law enforcement that he did not like police and had a history of eluding law enforcement. He was acting hostile and erratic toward law enforcement. As such, their attempts to disable his car to prevent his escape or any potential further harm he could pose to other officers was not unreasonable.

Plaintiff criticizes the tactical decisions leading up to PIT maneuver, noting that the officers did not attempt to use less intrusive alternatives of engaging Sabbe nor give any warnings or commands before driving onto the Sabbe property with armored vehicles. ECF 46 at 31–32. While this Court is sympathetic to Plaintiff's line of reasoning, "[w]hether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue." *Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994); *see also Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021)

(noting "[f]ederal law . . . generally focuses on the tactical conduct at the time of [the use force]"). Rather, as stated above, the inquiry is whether the force that was used to affect a particular seizure was *reasonable*. *Forrester*, 25 F.3d at 807; *see also Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("[T]he appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them.").

Plaintiff urges this Court to infer from the facts that Sabbe was merely defending his property from unknown intruders at the time the officers entered with their armored vehicles. *See, e.g.*, ECF 46 at 43. This Court finds such an inference to be unreasonable given the circumstances. The dash cam footage from Officer Jentzsch's car clearly shows that Sabbe saw Officer Jentzsch watching him in his marked patrol car earlier that day before driving away from Officer Jentzsch and further into the field. Later, at the time the armored vehicles drove onto the Sabbe property, officers had surrounded the Sabbe property and had closed off all public roadways nearby. Based on the videos and images of the property presented in the record, the bordering roadways were visible from a large portion of the open field where Sabbe had been driving. *See, e.g.,* ECF 47-10 (dash cam footage from Officer Jentzsch's patrol car, observing Sabbe from the vantage point of the public roadway); ECF 47-8 at 7–9 (maps and ariel views of the Sabbe property). At one point, a helicopter hovered over the Sabbe field, making so much noise that the police had to ask it to move away so they could hear themselves over the radio. ECF 47-23 at 1:03:39–52, 1:05:08–12; 1:10:46–11:04. While the V150 itself was unmarked, the BEAR that also entered the property was clearly marked as a law enforcement vehicle. *See* ECF 47-24 at 1. Officer Braun, driver of the V150, testified that Sabbe drove away from the V150 as it entered the property, and only turned around once he encountered another marked patrol car with headlights on across the field. ECF 47-6 at 8. In light of these circumstances, it would be

unreasonable to infer that Sabbe was merely defending his property from unidentified intruders when he rammed the V150. Indeed, the uncontroverted evidence in the record indicates that Sabbe was intentionally evading law enforcement.

Accordingly, once Sabbe escalated the encounter by using force against the officers, and then attempted to escape by driving away, it was reasonable for the officers to respond with a PIT maneuver to apprehend him. Officers in such circumstances could reasonably conclude that less intrusive means of apprehension or verbal warnings would prove futile, or may even expose the officers to further danger. As such, the officers' failure to verbally warn Sabbe or use other, less dangerous means to apprehend him does not render the PIT maneuvers unreasonable. *See City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) ("[I]t is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others.'") (quoting *Warden, Md. Peniten. v. Hayden*, 387 U.S. 294, 298–99 (1967)).

Plaintiff also asserts Sabbe was experiencing an emotional disturbance and Defendants were aware or should have been aware of this when they decided to respond with force. ECF 46 at 32. Whether a person suffers from emotional disturbance is relevant to the Fourth Amendment analysis, but it is not dispositive. *See Glenn*, 673 F.3d at 876–78; *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). The Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan*, 630 F.3d at 829; *see also Deorle*, 272 F.3d at 1283. When police use force against a person who presents an immediate threat, the presence of emotional disturbance does not reduce the governmental interest in using the force. *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014) ("The fact that Lal was intent on 'suicide by cop' did not mean that the officers had to endanger their own lives by allowing Lal to continue in his dangerous course of conduct."). Accordingly, even if it was

apparent to the officers that Sabbe was having some sort of mental health crisis, this factor is not dispositive and does not reduce the governmental interest in their use of force where the record makes clear that Sabbe posed a threat to the officers when he rammed the V150 and then attempted to flee with his pickup truck.

In light of the aforementioned circumstances, this Court finds that the balance of competing interests weighs in favor of the officers' use of the PIT maneuvers to disable Sabbe's car. Defendants are entitled to qualified immunity on Plaintiff's excessive force claim as it relates to the PIT maneuvers because they did not violate a constitutional right.

### b. The Shooting

The officers used deadly force against Sabbe when they shot and killed him. The intrusiveness of a seizure by means of deadly force is "unmatched" and implicates the highest level of Fourth Amendment protection. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9, (1985)). The issue, then, is determining whether the governmental interests at stake were sufficient to justify it.

Plaintiff contends the officers' decision to shoot Sabbe was unreasonable because, at that time, Sabbe's truck was rammed by the V150 and rendered disabled and therefore Sabbe posed no threat to the officers. ECF 46 at 33. Plaintiff asserts summary judgment on this issue is improper because there is a genuine dispute of fact as to whether Sabbe shot at the officers first, contending that he did not. ECF 46 at 33–34. Plaintiff argues circumstantial evidence shows a genuine dispute of material fact, pointing to the "miniscule amount of time Sabbe would have had" to fire at the officers, the difficulty he would have had in trying to raise a rifle while his truck was "spinning out of control," the dark tint of the windows of his truck obscuring the officers' view of him, the lack of any physical evidence that Sabbe fired his rifle at Defendants,

and the question of whether the rifle was later recovered in the cab of the truck or in the bed of the truck. ECF 46 at 37.

Defendants contend there is no genuine dispute as to whether Sabbe shot at the officers first, pointing to the unchallenged video evidence of the encounter and deposition testimony from Officer Brown and Officer Edwards in support. ECF 41-1 at 11. Specifically, Officer Brown testified that he saw Sabbe point and shoot at the V150 through the rear passenger-side window on the car while Sabbe was sitting in the driver's seat before returning fire. ECF 42-7 at 7–10. Officer Edwards similarly testified that heard Sabbe fire a gunshot from inside the V150, and then observed Sabbe "maneuvering his rifle to point out the passenger side of the car," towards the V150 before he fired one round at Sabbe. ECF 42-8 at 18–21.

An officer's use of deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others." *Garner*, 471 U.S. at 3. Although the parties focus on the question of whether or not Sabbe shot first at the officers, the "relevant question for the purposes of qualified immunity is whether [the officers] could reasonably have believed that [Sabbe] posed" a significant threat of death or serious physical injury to the officers or others. *A. K. H ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016); *see also Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (comparing the Supreme Court's "probable cause" deadly force language from *Garner* to the City of Portland's "reasonable belief" standard for deadly force and finding no material difference). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

This Court is mindful that in cases such as these where the best (and usually only) witness who could offer direct testimony for the plaintiff has died, Ninth Circuit precedent permits the decedent's version of events to be constructed circumstantially from competent expert and physical evidence, as well as inconsistencies in the testimony of law enforcement. *See George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013). However, a "bare allegation alone, without any evidence in the record," cannot support a denial of summary judgment. *See Foster v. City of Indio*, 908 F.3d 1204, 1217–18 (9th Cir. 2018) (emphasis omitted). Moreover, this Court is mindful that where an unchallenged video appears to show the incident in question, the Supreme Court instructs courts to view the facts "in the light depicted by the videotape," even on summary judgment. *Scott*, 550 U.S. at 381–82; *see also Hernandez v. Town of Gilbert*, 989 F.3d 739, 746 (9th Cir. 2021) ("While we view the facts in the light most favorable to the non-moving party at the summary judgment stage, we are not required to accept a non-movant's version of events when it is 'clearly contradict[ed]' by a video in the record.").

Viewing the facts as this Court must, this Court finds the record reveals the officers reasonably believed that Sabbe posed a significant threat. Put another way, there is no genuine dispute of fact material to whether Officer Brown and Officer Edwards could have reasonably perceived that Sabbe posed a significant threat of death or serious physical injury at the time they used deadly force against him.

The Court finds that the videos of the incident, ECF 43-2; ECF 47-11, do not clearly depict who shot first, so it neither refutes nor corroborates the officers' testimony that Sabbe pointed a gun at them and shot at them before they returned fire. However, the other circumstantial evidence Plaintiff relies on to sow doubt about the officers' testimony is contradicted by what the video clearly does show. First, roughly nine seconds elapsed from the

time Sabbe's truck was struck by the V150 to the time shots were fired. ECF 47-11 at 1:36–45.

That is enough time for someone in Sabbe's position to turn around, pick up a gun and fire it.

Second, contrary to Plaintiff's contention, the truck was not "spinning out of control" at the time

the shots were fired, making it difficult for Sabbe to hold and fire a gun. Instead, the video

clearly shows the Dodge Ram being pushed steadily clockwise. ECF 47-11 at 1:36–45. The tint

of the truck windows, and the lack of physical evidence that Sabbe fired at Defendants may raise

a "metaphysical doubt" concerning the officers' testimony, but it is not enough to raise a genuine

dispute of material fact in light of other evidence. Finally, this Court finds no support in the

record for Plaintiff's bald assertion that Sabbe's rifle may have been recovered from the bed of

his truck following the fatal incident, rather than from inside the truck.[7] In fact, the

uncontroverted evidence in the record indicates that officers had to disarm Sabbe immediately

following the shooting. *See* ECF 47-3 at 10. In short, Plaintiff points to evidence that is "merely

colorable" or "not significantly probative," but is not enough to present a genuine issue of fact

concerning the threat the officers' reasonably perceived. *See Anderson*, 477 U.S. at 249; *Scott*,

550 U.S. at 380–81.

"[A] law enforcement officer's use of force will be justified, or not, by what that officer

reasonably believed about the circumstances confronting him. *Price*, 513 F.3d at 968. At the time

of the shooting, the officers knew or should have known that Sabbe possessed a firearm, and had

previously discharged it on the field near two public roadways. The officers knew Sabbe was

likely intoxicated and had been behaving erratically. The officers witnessed Sabbe acting

---

[7] Plaintiff confirmed at oral argument that her only evidence for this assertion is a photo of a gun in the cab of Sabbe's truck. The photo shows officers standing around the truck with the V150 parked beside it. *See* ECF 47-27. The photo appears to have been taken following the shooting. This photo does not indicate whose gun is placed in the bed of the truck, or how it got there.

aggressively towards them when he hit the V150 with his truck. They witnessed him attempting to evade apprehension thereafter. Finally, Officer Brown and Officer Edwards testified that Sabbe pointed his rifle towards them and/or fired at them before they returned fire. The CAD report indicates an AR-15 was recovered on Sabbe's person. Nothing in the record, circumstantial or otherwise, calls into question the officers' credibility concerning what they saw. *See Long*, 511 F.3d at 906 ("We are mindful that we must be wary of self-serving accounts by police officers when the only non-police eyewitness is dead . . . however . . . here . . . we have the benefit of multiple eye witnesses and a CAD report that fairly and accurately recorded [law enforcement] activities.").[8] In short, Sabbe posed a significant threat of death or serious physical injury to the officers at the time he was shot.

Accordingly, this Court finds that the balance of competing interests weighs in favor of the officers' use of deadly force. The officers did not violate Sabbe's Fourth Amendment rights and they are entitled to qualified immunity on this claim.

### 2. Unlawful Entry

Plaintiff also contends Defendants violated Sabbe's Fourth Amendment rights by entering Sabbe's property without a warrant, consent, or exigency. ECF 47 at 26. The Fourth

---

[8] Even if Sabbe did not actually fire his rifle at the officers first, as the video evidence on this issue remains unclear, it is enough that the officers observed him pointing the rifle towards them under the circumstances. *See Long*, 511 F.3d at 906 ("[W]hether [the suspect] actually fired his rifle at these officers is [] immaterial. It is enough that [the officer] heard the radio transmission [saying the suspect was shooting at officers] and observed [the suspect] point the rifle in the officers' direction."); *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1116 (9th Cir. 2005) (suspect who ignored officers' commands, raised a two and a half foot sword, growled, and headed for a house posed an immediate threat of serious injury or death); *George*, 736 F.3d at 838 (noting when a person is armed, "a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."); *Henrich*, 39 F.3d at 914–15 (9th Cir. 1994) (suspect who opened a door and pointed a long gun at officers posed an immediate threat of serious injury or death).

Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "At [its] very core stands the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). The presumptive protection accorded people at home extends to outdoor areas traditionally known as "curtilage"—areas that, like the inside of a house, "harbor[] the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (quotations omitted).

The presumptive Fourth Amendment protection "is not irrebuttable." *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010). In particular, "[t]here are two general exceptions to the warrant requirement for home searches: exigency and emergency." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). The "emergency" exception stems from police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb; this exception does "not [derive from] police officers' function as criminal investigators." *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000), *abrogated on other grounds by Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006). By contrast, the "exigency" exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d

1195, 1199 (9th Cir. 1984) (en banc), *overruled on other grounds by Est. of Merchant v. Comm'r*, 947 F.2d 1390, 1392–93 (9th Cir. 1991).

Plaintiff contends, pursuant to the Ninth Circuit's decision in *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1078 (9th Cir. 2018), the officers' warrantless entry unto the Sabbe property was the factual and proximate cause of Sabbe's death, and therefore the officers can be held liable for his death based on the warrantless entry itself under traditional tort causation principles. ECF 46 at 26. Defendants assert exigent circumstances required immediate intervention. ECF 49 at 13.

The record shows that as the V150 and the BEAR entered Sabbe's property, officers suspected Sabbe had committed the crime of Unlawful Use of a Weapon, a Class C Felony. *See* O.R.S. 166.220; ECF 47-23 at 1:14:36–38. The record also reveals that the officers entered the property only after Sabbe "went mobile" and started to drive his car again. Their intent was to contain Sabbe on the property. ECF 47-6 at 10. They perceived Sabbe's movement as a threat to the officers positioned at the perimeter of the property, and a threat to the general public if Sabbe should enter a public roadway. ECF 47-5 at 14. Therefore, even if this Court assumes that the warrant presumption applied to the field that Sabbe was driving on,[9] the officers' entry here was likely reasonable under the emergency exception, *see United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008) (holding that a threat to officer safety falls under the emergency exception requirement), or the exigency exception, *see United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004) (explaining the exigency exception permits a warrantless entry where the officers have both probable cause to believe that a crime has been or is being committed and a reasonable

---

[9] It is quite possible that the field Sabbe drove on is more appropriately characterized as "open fields" rather than "curtilage" for the purposes of a Fourth Amendment analysis, but the record on this question is insufficient for this Court to rule on it.

belief that their entry is "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.").

Nevertheless, this Court need not decide the issue because even if Defendants' entry unto the Sabbe property was unreasonable under the Fourth Amendment, this Court finds it was not the proximate cause of Sabbe's injuries. "The proximate cause question asks whether the unlawful conduct," here, the allegedly unlawful entry of the officers in the V150, "is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury." *Mendez*, 897 F.3d at 1076. The touchstone of proximate cause in the § 1983 context is foreseeability. *Phillips v. Hust*, 477 F.3d 1070, 1077 (9th Cir. 2007), *vacated on other grounds*, 555 U.S. 1150 (2009).

Officers are free from liability, however, if they can show that the behavior of a shooting victim was a superseding cause of the injury. *Mendez*, 897 F.3d at 1081. As the Ninth Circuit explained:

> A superseding or intervening cause involves a shifting of responsibility away from a party who would otherwise have been responsible for the harm that occurs. If a resident sees that an officer has entered and intentionally tries to harm the officer, who in turn draws his weapon and shoots, the resident's intentional action would be a superseding cause of the injury.

*Id.* (citation omitted); *see also Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995) (noting that if a suspect were to shoot at persons known to be officers, the suspect's act would be a superseding cause absolving the officers of liability for harm caused as a result of an unlawful entry).

Here, Sabbe's actions in ramming the V150 and threatening the officers with a gun as they tried to apprehend him through the PIT maneuvers were "superseding causes," sufficient to

break the causal chain between the officers' alleged unlawful entry and Sabbe's harm. The record reveals that the officers entered the Sabbe property with the V150 in order to contain Sabbe and open a line of communication with him, while staying protected from any potential gunfire. ECF 47-6 at 2, 8, 10. It was not reasonably foreseeable from that entry alone that Sabbe would then decide to ram the officers with his truck. That action changed the scope of the officers' mission from communication to apprehension. ECF 47-6 at 10. Further, it was not reasonably foreseeable that even after repeated attempts to seize Sabbe through a PIT maneuver he would continue to resist law enforcement efforts and threaten the officers with a firearm.

In short, even if Defendants unlawfully entered Sabbe's property, Sabbe's harm was not proximately caused by the officers' unlawful entry. Defendants are entitled to qualified immunity on Plaintiff's unlawful entry claim as well.

### 3. Substantive Due Process

In order to establish a substantive due process violation, Plaintiff must show that Defendants' conduct "shock[ed] the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). To answer this question, this Court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.* (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)) (internal quotation marks omitted) (alterations in original)). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. *Id.* On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id.* For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even." *Porter*, 546 F.3d at 1140.

Reciting the high standard to prove a substantive due process claim, Defendants argue that Defendants' use of force was reasonable under *Graham*, and therefore there is no evidence that their conduct reaches the heightened level to "shock the conscious" as required for a substantive due process claim. ECF 41-1 at 13. Plaintiff urges this Court to deny summary judgment because "there is a triable issue of fact that . . . deliberation was practical under the circumstances." ECF 46 at 41. Plaintiff further proclaims a jury could find that Defendants were deliberately indifferent to Sabbe's safety in proceeding onto Sabbe's property "in the Commando V150 and BEAR without taking the time to verify information and properly assess the situation." *Id.*

This Court need not address whether the "deliberate indifference" or "purpose to harm" standard applies to Plaintiff's claim. Even under the more exacting deliberate indifference standard, this Court concludes that Plaintiff has not shown a genuine issue of material fact as to whether the conduct of the police rose to the level of shocking the conscience under the particular circumstances presented. Deliberate indifference has been equated with subjective recklessness, and requires Plaintiff to show that the state "official knows of and disregards an excessive risk to [the victim's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In short, the state actor must recognize an unreasonable risk and actually intend to expose the victim to such risks without regard to the consequences to the victim. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).

As stated previously, "[w]here the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving

party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387. Thereafter, the non-moving party

bears the burden of designating "specific facts demonstrating the existence of genuine issues for

trial." *Id.* "This burden is not a light one." *Id.* The non-moving party, Plaintiff, must show

evidence from which a jury could reasonably render a verdict in the non-moving party's favor.

*Id.*

Viewed against this backdrop, Plaintiff cannot show a violation of her substantive due

process rights. Plaintiff provides no citation to the record or any evidence for her argument.

Further, this Court is unaware of any evidence in the record to suggest that Defendants knew that

intervening as they did in response to a dangerous situation would automatically create an

excessive risk to Sabbe's safety, and proceeded in spite of this knowledge. Indeed, this Court

finds no support for the notion that driving onto the field with the V150 and the BEAR

automatically and necessarily exposed Sabbe to excessive risk. Plaintiff merely raises a

"metaphysical doubt" about the issue, asking this Court to infer deliberate indifference by

questioning the propriety of Defendants' tactical response. But metaphysical doubts and

conjecture are not enough to defeat summary judgment. *See Matsushita*, 475 U.S. at 586.

The record suggests Defendants made a decision that required a balancing of the risks

presented by Sabbe's behavior, against the risks presented by further delay. Merely suggesting

that Defendants incorrectly assessed the competing risks may show negligence, but it is not

enough to show a callous disregard for Sabbe's safety. Defendants are entitled to qualified

immunity on Plaintiff's substantive due process claim.

### 4. Clearly Established Law

Even assuming for the sake of argument Defendants did in fact violate a constitutional

right, they are still entitled to qualified immunity on Plaintiff's Fourth Amendment and

substantive due process claims because the constitutional right was not "clearly established" at the time the violation occurred.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle* v. *Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). "To determine whether [an officer] violated clearly established law, [courts] look to cases relevant to the situation [the officer] confronted, mindful that there need not be a case directly on point." *Landeros*, 837 F.3d at 1013 (citations and internal quotation marks omitted). However, "existing precedent must place the lawfulness of the particular [action] beyond debate," for which "a body of relevant case law is usually necessary." *Emmons*, 139 S. Ct. at 504 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"General excessive force principles, as set forth in *Graham* and *Garner*, are 'not inherently incapable of giving fair and clear warning to officers,' but they 'do not by themselves create clearly established law outside [of] an obvious case.'" *S.B. v. Cnty of San Diego*, 864 F.3d 1010, 1015 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very

much on the facts of each case," and thus police officers are entitled to qualified immunity unless

existing precedent "squarely governs" the specific facts at issue. *Id.* (internal quotation marks

omitted and emphasis deleted). Cases involving similar facts can help move a case beyond the

otherwise "hazy border between excessive and acceptable force" and provide notice to a police

officer that a specific use of force is unlawful. *Id.* at 18. (internal quotation marks omitted).

Accordingly, to defeat qualified immunity, Plaintiff must show that the state of the law as

of January 12, 2018, gave a reasonable officer "fair warning" that Defendants' actions in

entering the Sabbe property without a warrant, attempting two PIT maneuvers with the V150,

and fatally shooting Sabbe were unconstitutional. *See Hernandez*, 989 F.3d at 744; *see also*

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curium) ("Because the focus is on whether

the officer had fair notice that her conduct was unlawful, reasonableness is judged against the

backdrop of the law at the time of the conduct."). In her brief, Plaintiff principally relies on

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), and *George v. Morris*, 736 F.3d 829 (9th

Cir. 2013) to overcome this hurdle.[10] ECF 46 at 37–39. At oral argument Plaintiff also relied on

*Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017).

In *Deorle*, the Ninth Circuit held that police officers violated the Fourth Amendment

when they shot an emotionally disturbed man outside his house with a lead-filled beanbag round

when he was unarmed, but walking towards an officer. 272 F.3d at 1279–85. The officers were

called to the scene by the man's wife who was concerned about her husband who was drunk,

---

[10] Plaintiff also points to *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021) to defeat
qualified immunity. ECF 46 at 37–38. *Villaneuva* was decided in January of 2021, well after the
incident in question. As such, it could not possibly have put the officer Defendants on notice that
their behavior violated a clearly established constitutional right in January of 2018. *See Kisela*,
138 S. Ct. at 1154 ("[A] reasonable officer is not required to foresee judicial decisions that do
not yet exist in instances where the requirements of the Fourth Amendment are far from
obvious.").

acting out of control and becoming suicidal. *Id.* at 1276–77. The man initially "brandish[ed] a hatchet" and a crossbow and was verbally abusive to officers, threatening to "kick [their] ass," but complied with orders to drop the hatchet and the crossbow. *Id.* Later, he began walking at a "steady gait" in an officer's direction while unarmed. The officer then shot the man, without warning, with a lead-filled beanbag round when he arrived at a spot the officer had predetermined. *Id.* at 1275. The shot fractured the man's cranium and caused the loss of his left eye. *Id.*

The Ninth Circuit held that the force was unreasonable under the circumstances because the officer did not order the man to stop, tell the man to drop the bottle, or warn the man that the officer would shoot him if he did not stop, even though there "was ample time to give that order or warning and no reason whatsoever not to do so." *Id.* at 1284. The officer had a clear line of retreat, there were no bystanders nearby, and the man had previously been "physically compliant and generally followed all the officers' instructions." *Id.* at 1276, 1281–1282.

*Deorle* does not place "beyond debate" whether the officers' use of force under the circumstances of Sabbe's case violated the Fourth Amendment. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Most importantly, in *Deorle*, the court found a genuine dispute of material fact implicating whether the man posed an immediate threat to the safety of the officers or others. The court held, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." 272 F.3d at 1281. The court noted that the officer was "stationed in a secure position behind a tree, his line of retreat was clear, and [another officer] was stationed almost immediately behind him." *Id.* at 1282. The court emphasized the officer "could easily have

avoided a confrontation, and awaited the arrival of the negotiating team by retreating." The court held that the danger to the officers and others "appear[ed] to have been minimal." *Id.*

By contrast, here, there is no genuine dispute of fact material to the determination of whether Sabbe posed a clear threat to the officers' safety when Sabbe rammed the V150 with his pickup truck and drove away from them. Further, unlike in *Deorle*, the officers had reason to believe that Sabbe was armed and had fired his gun at them, or at the very least pointed his gun at them. Based on Sabbe's prior aggressive behavior towards the officers in ramming the V150, as well as their knowledge that he appeared to be armed during the interaction and pointing his weapon at them, the officers reasonably feared for their safety. Moreover, unlike in *Deorle*, the officers were not in a position to warn Sabbe before attempting the PIT maneuver and returning fire, as the threat they perceived was imminent, and given Sabbe's prior acts, any warning would have likely proven futile. Because the facts are so dissimilar, *Deorle* does not clearly establish that the officers' conduct in this case was unconstitutional.

Next, Plaintiff relies on *George* to defeat qualified immunity. In *George*, officers were responding to a domestic disturbance involving a firearm. The suspect was a sixty-four-year-old male with terminal brain cancer. 736 F.3d at 832, 839. He awoke in the middle of the night, retrieved his gun, and loaded it with ammunition. *Id.* When the three deputies arrived at the house, the suspect's wife met the deputies at the front door, advised them "not to scare her husband," and said that he was on the back patio "with his gun." *Id.* The officers set up a perimeter in the backyard. *Id.* Soon after, they saw the husband open the door to the second-floor balcony. *Id.* "Once he appeared in view of the deputies," the officers identified themselves as law enforcement and instructed the husband to show his hands. *Id.* The husband was using a walker

and was holding a gun in his left hand "with the barrel pointing down." *Id.* The three deputies

then shot the man approximately nine times. *Id.* at 833.

Because there was reliable evidence to support the plaintiff's version of the event, the

Ninth Circuit did not "credit the deputies' testimony that [the husband] turned and pointed his

gun at them." *Id.* at 838. The court also assumed that the husband did not take "other actions that

would have been objectively threatening." *Id.* On those facts, where the deputies shot the

decedent "without objective provocation while he used his walker, with his gun trained on the

ground," *id.* at 839, the court held that "a reasonable fact-finder could conclude that the deputies'

use of force was constitutionally excessive," *id.* at 838.

Again, the key concern in *George* was whether the suspect posed an immediate threat to

the safety of the officers or others. *Id.* at 838. The district court had found a genuine dispute of

fact such that a reasonable jury could "disbelieve the officers' testimony" and rely on record

evidence to conclude that the suspect had not ignored commands to drop the gun, or taken other

threatening measures such as pointing a weapon at the deputies. *Id.* at 835. Notably, as distinct

from this case, there does not appear to have been any video recording in the record of the

interaction between the officers and the decedent in *George*. Further, the district court in *George*

relied on competent medical and expert testimony to discredit the officers' testimony. By

contrast, no such expert or medical testimony exists in the present case. This Court has parsed

the evidence and found no genuine dispute of fact calling into question whether Sabbe posed an

immediate and serious threat to the safety of the officers before they used force against him. This

Court cannot discern any evidence, circumstantial or otherwise, from the record to establish a

genuine dispute of fact material to this "most important" *Graham* factor. As such, *George* is

inapposite, and does not clearly establish that the officers' conduct in shooting at Sabbe was constitutionally excessive.

Finally, Plaintiff relies on *Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017) to overcome qualified immunity. *Longoria* involved a 70-minute car chase of an unarmed suspect driving a stolen vehicle. At various times during the car chase the suspect stopped his vehicle and spoke with the pursuing officers but continued to ignore commands to surrender. During one of the stops, the man was seen holding rosary beads, and in another stop he was seen holding his wallet behind his back. *Id.* at 702. The chase ended when the suspect's car was disabled with a PIT maneuver. *Id.* at 703. The man got out of his stopped car and stood facing eight surrounding officers with one hand behind his back. *Id.* The defendant officer ran to the scene and took up a position between 25 to 45 feet to the suspect's right, further away from all of the other officers who had their weapons drawn. *Id.* The officer saw other officers shoot beanbag rounds at the suspect, striking him. Another officer tased the suspect, who in response flinched and moved erratically, "turned halfway around to his right—towards and past [the officer defendant]—to face his car and put his empty hands up above his head." *Id.* The officer then fired two rounds into the suspect's back, killing him. *Id.*

On appeal, the Ninth Circuit only addressed the constitutionality of shooting itself, the PIT maneuver was not examined. *Id.* at 705. Again, the central inquiry was whether the suspect posed an immediate threat to the shooting officer or the many officers around him, or whether a reasonable officer would have perceived the suspect to be an immediate threat. *Id.* The Ninth Circuit found many genuine disputes of fact material to the determination of whether a reasonable officer would have perceived that the suspect posed an immediate threat during the encounter. *Id.* at 707. For example, the court emphasized other competent evidence, including

real-time videos of the encounter, other eyewitness accounts, and the plaintiff's expert analysis called into question the shooting officer's contention that the suspect was assuming a "shooter's stance" the moment before he was shot. *Id.* at 708. Perhaps most relevant to this case, the court noted that a reasonable jury would be far less likely to credit the shooting officer's recollection, knowing that the suspect was, in fact, unarmed when he was killed. *Id.*

As with *Deorle* and *George*, *Longoria* is distinguishable from present circumstances because there is no genuine dispute of fact material to the "most important" *Graham* factor. The officers involved in Sabbe's shooting reasonably perceived an immediate threat to their safety, and unlike in *Longoria*, Sabbe was armed and acting aggressively during his encounter with law enforcement and no competent evidence calls into question the two officers' testimony that Sabbe pointed his rifle at them before they fired. *Longoria* does not clearly establish that the officers' conduct was constitutionally excessive.

Because Plaintiff cannot identify, and this Court cannot discern, any authority indicating Defendants violated a "clearly established" constitutional right, Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment and substantive due process claims on the second prong of the qualified immunity analysis as well.[11]

## B. *Monell*

"Pursuant to 42 U.S.C. § 1983, a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom." *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). Alternatively, "the plaintiff may prove that an official with final policy-

---

[11] Plaintiff did not attempt to provide any authority in her response brief or at oral argument to overcome the "clearly established" qualified immunity prong for her unlawful entry, PIT maneuver excessive force, or substantive due process claims.

making authority ratified a subordinate's unconstitutional decision or action and the basis for it."[12] *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

To prevail on a municipal liability claim under 42 U.S.C § 1983, Plaintiff must show that a municipal custom or policy caused the violation of Sabbe's constitutional rights. *Monell*, 436 U.S. at 690 (holding that a municipality is a "person" subject to damages liability under section 1983 when it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). If no constitutional violation occurred, then a municipal liability claim fails under § 1983. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (a *Monell* claim cannot survive without an underlying constitutional violation).

The threshold question in determining whether Plaintiff can establish *Monell* liability is whether a constitutional violation occurred. Defendants seek summary judgment on Plaintiff's *Monell* claim, contending the uncontroverted facts demonstrate that no underlying constitutional violation has occurred. ECF 41-1 at 13. This court agrees and finds that because no constitutional violation has occurred, Plaintiff's *Monell* claim must be dismissed as a matter of law. *Heller*, 475 U.S. at 799.

Moreover, even if there was an underlying constitutional violation, Plaintiff's *Monell* claim fails on other grounds. Although the precise legal theory Plaintiff espouses in unclear based on her Complaint, ECF 1 at ¶¶ 120–125, at oral argument, Plaintiff stated the basis of her *Monell* claim was municipal Defendants' failure to establish specific policies and training

---

[12] Plaintiff names both the Washington County Board of Commissioners and Sheriff Garrett as Defendants in her *Monell* claim. ECF 1 at ¶¶ 120–125. On the record before this Court it is unclear whether Sheriff Garrett is appropriately considered an official with final policy-making authority as required to establish *Monell* liability from his actions.

regarding the deployment of armored vehicles and their use in entering properties without a warrant.

To establish *Monell* liability caused by a government policy or longstanding practice or custom, the plaintiff must show that (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy, longstanding practice, or custom; (3) the policy, practice, or custom amounted to "deliberate indifference to the plaintiff's constitutional right;" and (4) the policy, practice, or custom was "the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotations omitted).

*Monell* liability can also arise from a failure to train, supervise, or discipline that amounts to a deliberate indifference to individuals' constitutional rights. *Horton*, 915 F.3d at 602–03. Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). To show deliberate indifference, Plaintiff must demonstrate that the need "'for more or different' action 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Hyun Ju Park v. City and Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)) (brackets in original).

Plaintiff has failed to identify any particular policy, practice or custom being challenged, or any evidence in the record to demonstrate that the policy, custom, or practice was the "moving force" behind the constitutional violation she alleges. *Dougherty*, 654 F.3d at 900; *see Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (*Monell* liability "must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method

of carrying out policy"). Similarly, Plaintiff has not produced any evidence to create a genuine dispute of fact concerning whether municipal Defendants' failure to train, supervise or discipline amounted to deliberate indifference of individuals' constitutional rights. *See Bryan Cnty.*, 520 U.S. at 410 (noting deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action"); *see also Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial).

Summary judgment on Plaintiff's *Monell* claim is granted.

## C.  State Law Claims

A district court may decline to exercise supplemental jurisdiction over state-law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c). When a district court dismisses all federal-law claims before trial, "the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity" will, in the usual case, "point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Because summary judgment is appropriate on all of the federal claims against Defendants, this Court, in its discretion, declines to exercise jurisdiction over Plaintiff's remaining supplemental state law claims. *See* 28 U.S.C. § 1367(c)(3); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 640–41 (2009) (district court has discretion to decline to exercise supplemental jurisdiction over state law claims where court has dismissed claims over which it had original jurisdiction); *Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001) (same). Accordingly, this Court will not address the parties' remaining arguments concerning Plaintiff's state law claims. Plaintiff's state law claims are dismissed without prejudice. As of the date of the order of

dismissal, Plaintiff will have at least thirty days to bring her state law claims in state court, should she desire to do so. *See* 28 U.S.C. § 1367(d).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF 41, is GRANTED with respect to Plaintiff's federal law claims. Plaintiff's federal claims are DISMISSED WITH PREJUDICE. Further, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED**.

DATED this 7th day of May, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge